SMITH v. DUNCAN.    (No. 49–2719.)

(Commission of Appeals of Texas, Section B. Feb. 19, 1919.)

1. GAMING ⊜⇒11 — WAGERING CONTRACT — SALE—MANNER OF FIXING PRICE.

A contract of sale of cotton, delivered at the time, is not a wagering contract, because providing that the price shall be market price on any day, within a certain future period, selected on its arrival by the seller.

2. TRIAL ⊜⇒251(4) — INSTRUCTIONS—ISSUES— CONTRACTS.

The jury may not be authorized to find that there was no contract, on the ground of absence of meeting of minds, but should be left to find, under all the evidence, what the real contract was, there being no contention that a contract was not made, especially where the contract has been executed by one party, and the controversy is as to a particular term of the contract—how the price to be paid should be determined.

3. SALES ⊜⇒364(2)—ACTION FOR PRICE—INSTRUCTIONS—PLEADING.

An instruction, in action for price of goods sold and delivered, authorizing the jury to find that there was no contract, on the ground that there was no meeting of minds as to how the price should be fixed, is properly refused, plaintiff by his petition alleging in the alternative that, if it be found the contract was not as claimed by him, then he seeks a recovery on the contract as it is claimed by defendant to have been.

4. SALES ⊜⇒87(3)—CONTRACT—PROVISION AS TO PRICE—EVIDENCE.

Evidence in action for price of goods sold *held* to support a finding that contract was substantially as claimed by plaintiff as to what should be the price.

5. SALES ·⊜⇒77(1)—ELECTION AS TO PRICE— NOTICE.

Plaintiff did all that was necessary under his contract of sale of cotton, providing that the price should be the market price on a day to be selected by him within a certain time, where on the day selected, defendant being at home sick, he gave notice to all present at defendant's place of business, and, on their denying authority to represent him, attempted to notify him at home, and, not being allowed so to do, requested defendant's brother to notify him.

⊜⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

6. SALES ⬥⟳77(1) — ELECTION AS TO PRICE — NOTICE—ESTOPPEL TO DENY.

Defendant, to whom plaintiff sold cotton with provision that price should be the market price on any day plaintiff should select within a certain period, was estopped to deny sufficiency of notice of selection, having before expiration of the time for selection, with knowledge of attempted notice, written plaintiff that he would settle as soon as he was able to see him.

Error to Court of Civil Appeals of Third Supreme Judicial District.

Action by F. M. Duncan against Charles B. Smith. Judgment for plaintiff was affirmed by the Court of Civil Appeals (167 S. W. 233), and defendant brings error. Affirmed.

Jno. B. Durrett, of Belton, and Sam D. Snodgrass, of Temple, for plaintiff in error.

A. L. Curtis, of Belton, for defendant in error.

MONTGOMERY, P. J.  F. M. Duncan brought this suit against Charles B. Smith. The suit grows out of a contract between the parties by which Duncan sold and delivered to Smith 1,188 bales of cotton. For convenience the parties will be designated as plaintiff and defendant as they appeared in the trial court.

The plaintiff, Duncan, alleged that on November 11, 1912, a contract was entered into between the plaintiff and the defendant by which it was agreed that the plaintiff should sell and deliver to the defendant, and that the defendant should buy, certain cotton; that the agreement was that the cotton should be delivered by plaintiff to defendant, and that upon delivery defendant should pay 10 cents per pound "basis middling," but that the ultimate price to be paid for the cotton should be fixed as follows: That plaintiff should have the right to elect to take the market price of the cotton at Belton, Tex., on any day to be selected by him prior to March 1, 1913; that the plaintiff delivered under the contract 1,188 bales of cotton. The plaintiff alleged that under the contract he named November 27, 1912, as the day on which the price of the cotton should be determined, and notified the defendant thereof, and demanded payment of the price of the cotton as of that day in Belton, Tex. The plaintiff further alleged that "middling cotton" on said day in Belton, Tex., was of the market value of 12 5/16 cents per pound. Plaintiff sued for the difference between the amount paid him by defendant at the time of delivery and the market value of the cotton at Belton, Tex., on November 27, 1912, less certain admitted credits. The petition contained many other averments, but, as no question is raised as to the pleadings, the above will be a sufficient statement as to the contents of the petition. Defendant filed a general denial and certain special pleas not material to the questions discussed.

The plaintiff testified to the contract as alleged, and further testified that under the contract he had delivered 1,188 bales of cotton. The contract was verbal and made over the telephone.

The defendant admitted making a contract for the purchase of the cotton and the delivery of the cotton under the contract, but testified that the ultimate price to be paid was to be determined, not by the market price of the cotton on the date selected by plaintiff, but by his (the defendant's) "basis limit" on that day.

The plaintiff was a cotton buyer, living at Killeen, and the defendant was the president and principal owner of a corporation engaged in the hardware business at Belton, Tex., known as the Smith-Peyton Hardware Company. Defendant was also engaged in the cotton business on his own account under the name of Charles B. Smith & Co. Defendant's office and place of business was at the store occupied by the hardware company, and from this place of business he carried on his cotton business as well as superintended the business of the hardware company. It was in evidence that some of the employés of the hardware company performed services for the defendant in his cotton business, but there was no evidence that such employés had any authority to make purchases or settlement for cotton purchased by Charles B. Smith & Co.

The only difference between the parties as to the contract is that the plaintiff testified that the price was to be determined by the market price on the day named, while the defendant testified that his "basis limit" on the day named should control.

Upon this issue there was no evidence, outside of the conflicting statements of the parties, except a letter of confirmation written by defendant on the day after the verbal contract was made. This letter was as follows:

"October 12, 1912.

"Mr. F. M. Duncan, Killeen, Texas:

"Dear Sir: Confirming our conversation over the phone last night, beg to say that we will advance ten cents per pound 'basis middling' on such cotton as you may ship us, we to use the cotton and settle with you on our basis limit at any time between now and March 1, 1913, your option as to date. When you report the cotton as sold to us, settlement will be made as between us at the difference between ten cents and the basis price you sell at. No charge will be made for interest or insurance. We presume you are shipping the three hundred bales to-day. If you have more we would be glad to use not to exceed one thousand bales on about the same basis.

"Yours truly,  Charles B. Smith."

Plaintiff, Duncan, testified that he never in fact saw the letter copied above, but that

if he had seen it he would have made no objection, as his understanding was that the words used in the letter meant practically the same thing as the market price.

The evidence shows that Charles B. Smith when the contract was made was regularly in the cotton business, and the parties evidently contemplated that he would continue in such business. After all the cotton had been delivered, and defendant, Smith, had paid approximately 10 cents per pound, as provided in the contract, and on November 23, 1912, Charles B. Smith became sick, and from that date until some time in the following January was confined to his home. During the first two or three weeks of his illness he was unable to transact any kind of business, and, under the instruction of his physician, was not permitted to see any one about any business matter. The defendant testified that during the time he was sick he was out of the cotton market entirely, and that he had no "basis limit," and that no one was authorized to represent him with reference to his cotton business; that he had no agent and no employés.

On November 27, 1912, "middling cotton" was of the market value in Belton, Texas, of 12⁵/₁₆ cents per pound. On that day plaintiff, Duncan, determined to close out the cotton and demand a settlement in payment for the cotton, in accordance with the contract, based on the market value of the cotton on that day; and for the purpose of carrying out this intention, and notifying Smith of his selection of that day under the contract, plaintiff went to the Smith-Peyton Hardware Company's place of business, where defendant, Smith, kept his office, and there informed the persons present and conducting the business of his election to take the market price of the cotton on that day, and requested a settlement. All the persons present informed him that defendant was sick, and that they had no authority whatever to represent him. Plaintiff then went to Smith's home for the purpose of notifying him in person, but was refused permission to see him. Plaintiff on the following morning saw a brother of the defendant, and requested him to inform the defendant that he had elected to take the market value of November 27th for the cotton. The evidence of the brother is that this message was not delivered for several weeks. After defendant had recovered from his illness, according to plaintiff's testimony, he (Smith) told the plaintiff that he had told his brother when the message above was delivered "to hedge the cotton; that he was not able to attend to it at that time."

There seems to have been no further communication between the parties until on December 20th, when plaintiff wrote a letter addressed to Smith-Peyton Hardware Company. In this letter he requested a settlement for the cotton on the basis of the market value of the cotton on November 27th; that is, on the basis of 12⁵/₁₆ cents per pound for "middling cotton." On the day after this letter was written, defendant sent plaintiff a check for $3,000 on the cotton account.

The defendant testified, however, that the check was sent before he received the letter, and that he sent it because he had learned that plaintiff wanted to close the account, and for the further reason that the price of cotton then justified the payment. On December 23d the defendant wrote and mailed to plaintiff a letter, in which he said:

"Your letter of the 20th instant to Smith & Peyton Hardware Company handed me to-day. While I own four-fifths of this concern's stock, it has no connection with my Western cotton business; hence Mr. Stockton has no authority to take up the matter with you. The moment I am able to get up you and I will make satisfactory settlement of the consigned cotton. My doctor says looks like January 1st."

There was evidence that the price of cotton on November 27th and 28th was 12⅜ cents "basis middling"; that on December 20th it was 12½ cents; on December 23d it was 12½ cents; and on December 24th it was 12⁷/₁₆ cents; and that on February 28th it was 12 cents. There was evidence that the price of cotton did not depreciate materially until some time in the early part of January, and on the 10th day of January it had depreciated to about 12¼ cents per pound "basis middling."

There was evidence by several experienced cotton dealers as to the meaning of the term "basis limit" as used by cotton men. From all the evidence it appears that practically all cotton is sold on what is called "basis middling"; that is, that the market price of "middling cotton" fixes the price of all cotton, whether below or above that grade. It also appears that each dealer in cotton from day to day establishes what is called a "basis limit"; that is, the highest market price which they, or buyers in their employ, may pay for "middling cotton," and this basis automatically fixes the price for all other grades. To illustrate, we quote from the testimony of W. L. Van Lieu:

"All the buyers do not have the same limit on the same day, but you find them running about in line. The limits are not controlled by the market price. The limits make the market price. We have in the neighborhood of fifteen or twenty buyers in Temple, and these buyers may vary a few points on their limit on the same day, but you find them all about in line, but they do vary a little. Some days a buyer has a limit more than another buyer, and will pay more than another buyer. When you hear the expression 'a buyer is out of the market' it means that he is not in the market even at the price cotton is bringing."

This witness further testified that one-sixteenth of a cent is a legitimate variation to

occur in a buyer's basis limit. This witness further testified:

"If a man took over twelve hundred bales of cotton, and sold it, and the cotton is gone, there is no reason on earth, when he comes to settle with that man, why there should be any difference between his basis limit and the market price, if he wants to make a square deal."

He further testified that when cotton was sold to be paid for in the future, and there was any difference between the buyer's basis limit and the market price, that the market price would control; that this was customary among all cotton men on consignments.

There was also evidence conflicting with the above. Some witnesses testified that there might be a quarter of a cent difference on the basis limits of different buyers on the same day, but those having the lower limits would in fact be out of the market. There was also evidence offered by defendant that, when a contract was made to sell at a price fixed by the buyer's limit, this would control over the market price, and that, if the seller was not satisfied with the buyer's limit, he must postpone selling until the buyer had put out a higher limit. Such other testimony as we think material to the points discussed will be shown in the opinion.

The plaintiff recovered judgment in the trial court for the value of his cotton, based on the market value on November 27, 1907. The defendant appealed and the judgment was by the Court of Civil Appeals affirmed (167 S. W. 233). A writ of error in this case was granted on the application of the defendant, Charles B. Smith.

## Opinion.

[1] The first assignment of error contained in the application attacks the judgment upon the ground that the contract sued on is a wagering contract, and it is urged that for this reason the court should have refused to enforce it. This point was not made either in the trial court or the Court of Civil Appeals.

We think the contract is not subject to this objection. Similar contracts are frequently made by persons engaged in the cotton trade, and no doubt by dealers in other commodities. In this case the cotton was sold and actually delivered with an agreement that the price to be paid should be determined by the state of the market on a day to be selected by the seller in the future. Duncan owned the cotton, but did not wish to take the then market price. Smith wished to buy the cotton, and was willing to take it and pay the value of the cotton at a future day to be selected by Duncan. It has been decided in this state that the owner of property has the right to sell the same and contract for the future delivery thereof, provided an actual delivery is contemplated, and

that the price may be left to be determined by the state of the market at the time of delivery. Cleveland v. Heidenheimer (Civ. App.) 44 S. W. 554; s. c., 92 Tex. 108, 46 S. W. 30.

We can see no good reason why, having sold the cotton under an agreement that the future market value should determine the price, Duncan could not deliver it in advance of the time fixed for the determination of the price. We have been cited to no case condemning a transaction of this character, and, after some search, have been unable to find a single case supporting the view of the plaintiff in error. The cases cited by the plaintiff in error are clearly distinguishable from this case.

[2] Complaint is also made of the refusal by the trial court to give to the jury the following special instruction requested by plaintiff in error:

"You are instructed that if at the time of making the contract in question the plaintiff understood that the price of the cotton sold to him by defendant was to be fixed by the 'market price' of said cotton on any day between the date of delivery of same and March 1, 1913, at his option as alleged in his petition, and defendant at said time understood that the price of said cotton was to be fixed by the 'basis limit' of the defendant, Chas. B. Smith & Co., and if there was a material difference in the meaning of the terms 'market price' and 'basis limit,' then the minds of the parties did not meet, and there was no agreement between them as to the price to be paid for said cotton, and upon a delivery of said cotton in such case the law would fix the price by implication at its reasonable value at the time of its delivery; and if you so find that there was no agreement as to the price of said cotton, then you will find the total reasonable market value of said cotton at the time of its delivery, and, after deducting the total payments made by defendant to plaintiff from such total value, render your verdict for the balance, if there is a balance, and if there is no balance, then you will find for defendant as to plaintiff's claim, and so say by your verdict." (Tr. p. 15.)

We think this charge was properly refused. The charge in effect instructs the jury that if, at the time the contract was made, the plaintiff understood that the price was to be fixed by the market value of the cotton, and the defendant understood that the price was to be fixed by the defendant's "basis limit," and if there was a material difference in the meaning of the two terms, that then there was in fact no contract.

In this case both parties testified that there was a contract. The contract had been wholly performed by the defendant in error, Duncan, and partly performed by the plaintiff in error. There was no pleading raising the issue of a mistake growing out of the misconception by the parties of the terms used. In other words, the issue in this case was not as to the existence of the contract, but as to

its terms. If, as claimed, there was a material difference between the terms of the contract, as testified to by the parties, then the issue was one of fact to be submitted to the jury as to what contract was in fact made.

In the case of Bewick v. Butterfield, 60 Mich. 203, 26 N. W. 881, the court gave a charge similar to that requested in this case. In the Michigan case the court said:

"The remarks of the court in relation to the meeting of the minds of the parties in that talk being necessary to make a contract between the parties was good law in the abstract, but might have been, and undoubtedly was, under the facts of this case, misleading. There was no pretense that the minds of the parties did not meet in some kind of an understanding. The whole controversy was as to what the defendant said. The defendant made some kind of a promise. Comstock recollected it to be one thing, and defendant another. If the jury believed Comstock, Butterfield promised to pay for the running of the logs if plaintiff did any work upon them. If they believed Butterfield, the contract was, in substance, to pay for the running of defendant's logs, if plaintiffs did more work upon the mixed logs than defendants did. But from the language of the court the jury might easily have inferred that because the parties recollected the promise differently there was consequently no promise at all, as the minds of the parties did not meet in their remembrance of the talk."

In the case of Power State Bank v. Carver, 148 S. W. 341, the Court of Civil Appeals for the Second District had under consideration a case where there was a sharp conflict in the testimony as to the terms of a verbal agreement, and in which the lower court had given a charge similar to that requested in this case. The court said:

"The case was one of simple conflict in evidence; Carver specifically stating that the agreement was that the defendants were to pay him $2 per head for pasturing their cattle until April 1, 1910. The testimony of the defendants was in direct contradiction, and to the effect that the pasturage for that length of time was to be paid for at the rate of $2 per annum. The charge, therefore, relating to a meeting of the minds of the parties, however correct in the abstract, was misleading, in that the jury might have believed from the evidence that the contract in fact was as testified to by Carver, but that the defendants understood it otherwise."

Where, as in this case, there is no contention that a contract has not been made, and especially where the contract has been executed by one of the parties, and the controversy is as to some particular term of the contract, we do not think it permissible to authorize the jury to find that no contract was made. It should be left to the jury to find, under all the evidence, what the real contract was.

The case of Hubbard City Cotton Oil & Gin Co. v. Nichols (Civ. App.) 89 S. W. 795, is one in which it was held that it was proper to authorize the jury to find that the minds of the parties did not meet. In that case the real question in controversy was whether a contract of any character was in fact made, and the evidence left it in doubt as to whether the parties ever in fact reached any agreement. In a case of that character the giving of a charge such as requested in this case would not be improper, but the difference between the issues in the two cases is manifest from what we have already said.

[3] We also think that the charge was properly refused because the plaintiff in his petition alleged in the alternative that, if it should be held that the contract was not as claimed by him, then he sought a recovery upon the contract as claimed by the defendant. Under either theory the plaintiff was entitled to recover provided he had himself complied with the contract. If the plaintiff was mistaken in this understanding of the contract, he, after full performance, was certainly entitled to recover what was due him under defendant's theory of the contract.

[4] There was ample evidence, in our opinion, to support a finding by the jury that the contract was substantially as alleged and testified to by plaintiff, Duncan. Therefore we overrule all assignments attacking the verdict upon the ground that the evidence was insufficient to show the contract as alleged.

[5] The only other assignment which we deem it necessary to notice is that claiming that the evidence is insufficient to authorize the judgment for the alleged reason that the evidence failed to show that Duncan had complied with the contract by naming a day for the fixing of the price of the cotton, and giving Smith notice thereof, as contemplated by the contract.

It is evident that the plaintiff in error could not defeat the rights of the defendant in error under the contract by abandoning the cotton business, whether the abandonment was voluntary or involuntary. Nor could the rights of the defendant in error be defeated by the circumstance that, by reason of the condition of plaintiff in error, it became impossible for the defendant in error to give him actual notice of his selection of a particular day, as provided in the contract. The defendant in error on the day designated by him gave notice to all the persons present at the plaintiff in error's place of business. Finding no person there claiming to have authority to represent the plaintiff in error, he attemped to notify him at his home, but was prevented from doing so. He then requested a brother of plaintiff in error to notify him. Our opinion is that he did all that was required of him under the circumstances.

[6] We also think that when plaintiff in error received the letter written by the

defendant in error, on or about December 22d, notifying him of his claim to have designated November 27th under his contract, and replied thereto promising a settlement as soon as he should be able to see him, that this was in effect a promise to settle upon the basis of the market price on November 27th. At the time this letter was written plaintiff in error, Smith, knew of the effort made by Duncan on November 27th to notify him of the selection of that day under the contract for fixing the price of the cotton, At that time the price of cotton was higher than on November 27th, and, if Smith had then informed Duncan that he would not settle for the cotton on the basis claimed by him, Duncan would have selected another day on which the price was even higher than that then demanded by him. Having by his letter led Duncan to believe that he would settle on the basis claimed, and thus prevented Duncan from naming another day, we think that Smith is liable, even though Duncan had not in fact fully complied with the contract as to giving notice. The letter was an unequivocal promise to settle for the cotton. Under the contract no settlement or payment was due unless Duncan had selected a day in order to fix the price. Duncan evidently understood the letter to mean that Smith would settle on the basis demanded by him, as, if he had understood otherwise, his self-interest would have prompted him to name a day on which the price of cotton was higher than on November 27th. If the notice given by Duncan was for any reason insufficient, we think the letter should be held to be a waiver of any such defect in the notice.

We believe the Court of Civil Appeals properly decided all other matters complained of, and believe it would be unprofitable to further discuss them. Our conclusion is that the judgments of the trial court and the Court of Civil Appeals should be affirmed.

PHILLIPS, C. J. The judgment as recommended by the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.