**NATIONAL UNION FIRE INS. CO. OF PITTSBURGH, PA., v. CALIFORNIA COTTON CREDIT CORPORATION.**

**GENERAL INS. CO. OF AMERICA v. SAME.**

**No. 7434.**

Circuit Court of Appeals, Ninth Circuit.
Feb. 25, 1935.

As Amended on Denial of Rehearing
April 29, 1935.

Christopher M. Bradley, of San Fran--cisco, Cal., W. W. Hindman, Hindman &

Davis, and Angus C. McBain, all of Los Angeles, Cal., and Ralph S. Pierce, of Seattle, Wash., for appellants.

Dempster McKee, of San Diego, Cal., and Eugene D. Bennett, of San Francisco, Cal. (Pillsbury, Madison, & Sutro, of San Francisco, Cal., of counsel), for appellee.

Before WILBUR and GARRECHT, Circuit Judges.

WILBUR, Circuit Judge.

These two actions were heard and decided together by the District Court; a trial by jury having been waived by written stipulation. The complaint in the action against the National Union Fire Insurance Company of Pittsburgh, Pa., consists of fifteen separate causes of action stated in separate counts, each cause of action being based upon a separate policy of insurance issued by the appellant company to insure the cotton crops for the season of 1929 of fifteen separate and individual growers against loss by perils specified in the respective policies. The complaint in the action against appellant General Insurance Company consists of fourteen separate causes of action stated in separate counts, each cause of action being based upon a separate policy of insurance issued by the appellant company to insure the cotton crops for the season of 1929 of fourteen individual growers against loss by perils specified in the respective policies. With one exception, the cotton crops insured by both appellants were the same; the exception being the cotton crop of Dave Davidson which was insured by the National Union Fire Insurance Company alone. As to the other crops insured, the policies in each action are contributing policies whereby each appellant was to answer for one-half of any losses to the extent expressed in the policies. Each of the growers named in the policies of insurance herein involved was financed by appellee, California Cotton Credit Corporation, through the medium of the Federal Intermediate Credit Bank in Berkeley, Cal. Chattel mortgages were given by the respective growers upon the growing crops of cotton to secure the advances made by appellee, and appellee is an assured in each of the policies as its interest may appear, being named in the application for each of the policies as a party to which payment of loss, if any, should be made as its interest may appear. Appellee is also the assignee for collection of each of the growers of the claims of each of the growers arising out of this insurance. Plaintiff-appellee brought these two actions to recover for losses in the cotton crops of the respective growers due to perils specified in the policies of insurance.

The trial court rendered judgment for plaintiff-appellee upon all causes of action alleged in the two complaints except the ninth cause of action in the National Union case and the eighth cause of action in the General Insurance case, both involving the same crop and grower, wherein judgment was rendered for the defendants-appellants. Appellants have appealed from these adverse judgments.

It is admitted by appellants that there were losses from perils specified in the policies, but they contend that appellee is not entitled to recover because (1) the respective growers had voided their policies by various breaches of the conditions and warranties of their policies; (2) there was no evidence introduced by appellee on which the amount of the losses, if any, could be computed in accordance with the definite method of computation provided therefor by the policies; and (3) these actions were prematurely commenced, and at the time of their commencement, there was nothing due or owing from appellants to appellee.

It is claimed by the appellants that the policies herein involved were rendered null and void by reason of the failure of the appellee or the insured growers to keep or cause to be kept complete records of the grading and classing of the cotton and by reason of the failure of appellee to produce such records upon request by appellants. This contention is based upon a provision in the applications for the policies of insurance involved herein, which constitute a part of the contracts of insurance, as follows: "(5) That the applicant shall keep, or cause to be kept, a complete record in detail of the harvesting, grading or classing and selling or marketing of the crops herein described and of all sales, payments and settlements concerning the said crops; that said records and/or any records, correspondence or other data available to or in the possession of the applicant and/or any agent of the applicant relating in any way to the production of any crop or crops on the land herein described or on any portion thereof during any season or seasons previous to the present sea-

son shall be produced for the inspection of any duly authorized representative of this Company upon request; and that the failure or refusal on the part of the applicant to comply with any of the terms of this paragraph shall render the insurance now being applied for null and void and shall constitute a perpetual bar to any recovery thereunder."

On May 9, 1930, appellants sent to each of the insured growers a written request to produce for inspection a complete record in detail of the harvesting, grading, or classing and selling or marketing of the crops insured in accordance with the above-quoted provision. By letter dated May 14, 1930, appellants were informed that such records were in the Los Angeles office of appellee, and would be available to them there. A certified public accountant was sent by appellants to inspect the records, and in his report it is stated: "It will be noted that, on these forms, space is provided for recording the grade of the cotton. In no instance was the grade indicated, and I was informed by Mr. Dawson of the Pacific Cottonseed Products Corporation, [parent company of appellee] that the cotton was usually sold on a 'hog-round' basis, that is, the broker buys a quantity of cotton, the shipment from several growers, at the current market quotation for middling grade cotton. Adjustment for on or off middling grade is subsequently made by the broker, and any remittance received is prorated to the growers' accounts by means of the credit memo (schedule 2). The brokers' advices did not show the grade for each growers' cotton."

John W. Spencer, a representative of appellants who was present at the time the records were inspected, testified: "All that I recall that was missing was the record of grades and classes of each bale."

Jack C. Thompson, a witness for appellee, testified, concerning the records of grading and classing, in part, as follows: "I was in charge of the insurance covering and appertaining to these various crops during the year 1929 by resolution of the board of directors of the California Cotton Credit Corporation; I caused to be kept a complete record of grades and classes on all of the lint cotton covered in these various losses and have that record in court; these records were kept by the buyer of the cotton in individual cases and forms were submitted by California Cotton Credit Corporation to the buyers and the grades

inserted in each instance as to each grower; the form for the insertion of the various grades was prepared under my supervision."

On cross-examination this witness testified: "I believe the grades were inserted during the month of May 1930, not later than June 10th. * * * While negotiating with Mr. Miller, Mr. Glidden and others, I told them that all of these grades were being prepared and would be ready for them; I told that to Mr. Miller, or Mr. Glidden, either one, I do not recall, in their office in Los Angeles; it must have been during the time they were being prepared that I told them this; it must have been in the month of May; I don't know what they said about it when I told them I was having them prepared; either Mr. Miller or Mr. Spencer had asked me to have available a full record of grades and classes and I told them we did not have a full and complete record at that time but it was being obtained."

It appears from this testimony that records were caused to be kept by appellee, but that these records were those of buyers' grades and were not available until some time after the demand was made by appellants. Appellants contend that they were entitled to a record of grading or classing kept by the sellers because the grading or classing done by different parties very often resulted in different grades being attached to the same cotton. The provision in the contract of insurance requiring the keeping of records does not specify the type of records of grading or classing to be kept, nor does it specify that the records be kept by the insured, but only that the insured either "keep or cause to be kept" records of grading or classing. The above-quoted provision of the application does not specify that the grading or classing shall be done by the insured. If the insurance company desired a grading or classing of the cotton by the insured, it should have so provided in the application.

Where there is uncertainty or ambiguity in a provision of a policy of insurance, the court will favor the construction which will avoid a forfeiture, if it can reasonably do so. Fidelity & Casualty Co. of N. Y. v. Phelps (C. C. A.) 64 F.(2d) 233, citing McMaster v. N. Y. Life Ins. Co., 183 U. S. 25, 22 S. Ct. 10, 46 L. Ed. 64. If the policy is uncertain, it must be construed in favor of the insured and against the insurer. Imperial Fire Ins. Co. v. Coos Coun-

ty, 151 U. S. 452, 462, 14 S. Ct. 379, 38 L. Ed. 231; Mutual Ins. Co. v. Hurni Co., 263 U. S. 167, 174, 44 S. Ct. 90, 68 L. Ed. 235, 31 A. L. R. 102. We think the trial court correctly found that there was compliance with the provision requiring the keeping of records.

Appellants also contend that failure to produce the records of grading or classing immediately upon request rendered the policies void. There is evidence to the effect that the records of grading and classing which were produced at the trial were compiled from the permanent records of the buyers of the cotton and with one exception these records were compiled during the same month in which the request to produce the records was made by appellants. In one instance, through an oversight, the record of grades was not compiled from the buyer's permanent record until October of 1931, but the record from which the compilation was made was in existence all of this time. Upon learning of the absence of records of grading or classing at the time the other records were inspected by appellant's representatives, appellants made no claim of forfeiture of the policies for that reason, nor was any mention made of records of grading or classing during the discussions and negotiations for settlement of these claims which took place during May and June of 1930. After appellants' representatives were informed that these records were being prepared, there was no further request by appellants to inspect them. It was not until these actions had been filed that appellants claimed a forfeiture of the policies by reason of a breach of warranty with regard to the records of grading or classing.

It will be noted that the provision in the contract merely requires " * * * that said records * * * shall be produced for the inspection of any duly authorized representative of this company upon request." It does not specify how soon after the request the records must be produced, and therefore a reasonable time is allowed for the production of such records. With one exception, the records of grading and classing were compiled and available for inspection within a reasonable time after appellants' request for their production. As to the one instance where the record of grading was not available for inspection until October of 1931, it need only be said that appellants did not call attention to the inadvertent omission of such records and made no further request to inspect such records as to put the insured in default.

Provisions requiring the keeping of records and their production upon request for inspection by the insurer are promissory warranties. Substantial compliance with a promissory warranty is sufficient. Nat'l Surety Co. v. Earl Park State Bank (C. C. A.) 63 F.(2d) 825, citing Liverpool & London Globe Ins. Co. v. Kearney, 180 U. S. 132, 21 S. Ct. 326, 45 L. Ed. 460; Bank of Union v. Fidelity & Casualty Co. of N. Y. (C. C. A.) 62 F.(2d) 1040; Home Ins. Co. v. Hightower (C. C. A.) 22 F.(2d) 882, 62 A. L. R. 620; 26 C. J. § 317, p. 249; 3 Cooley's Briefs on Insurance, 2330 et seq. See, also, Note in 51 L. R. A. 698.

There is ample evidence in the record to support the finding of the trial court in favor of appellee to the effect that there was no breach of the provisions regarding the records of grading or classing.

It is contended by appellants that there was also a breach of the provision of the contract of insurance requiring "that all of the crops herein described will be warehoused, stored, shipped, marketed or sold at or through California Cotton Credit Corporation [appellee] at Tulare Postoffice, State of California. * * *" Appellants' contention that there was a breach of this provision is based upon the admitted fact that none of the cotton harvested from the crops insured was ever actually in Tulare, Cal., and therefore was not warehoused, stored, or shipped at or through Tulare. Bishop A. Hughes, a witness for appellee, testified that all of the cotton harvested from these crops was marketed and sold at Tulare, and that the procedure followed by appellee in handling these sales was as follows: "Each bale of cotton was covered by an individual bale receipt bearing a number and the weight of the cotton; this bale receipt was made out in the name of the California Cotton Credit Corporation, the Federal Intermediate Credit Bank of Berkeley and the grower; this bale receipt was transmitted to the headquarters office of the California Cotton Credit Corporation at Tulare, and turned over to me for invoicing to the buyer to apply on the sales contract that had previously been made by Joel B. Noble as secretary-treasurer. These bale receipts were then endorsed by the California Cotton Credit Corporation in the same manner as a check and attached to a draft which was deposited

in the bank, drawing on the buyer, and the California Cotton Credit Corporation received a credit at the bank for the proceeds of the draft at the time of deposit; these bale receipts were issued by the gin company, Pacific Cottonseed Products Corporation, of which the California Cotton Credit Corporation is a subsidiary."

It will be noted that the provision now under consideration is in the alternative so that compliance with any one of the alternatives is a literal compliance with the provision. The general rule of construction is well stated in 32 C. J. 1296, as follows: "Terms and conditions in a contract of insurance which may operate to work a forfeiture are to be construed most strictly against the party seeking their enforcement, and, where susceptible of more than one meaning, that meaning which is most favorable to the insured should be adopted. * * * The scope of a provision for a forfeiture or of a warranty will not be extended by implication, and the parties cannot be presumed to have intended that any circumstances shall be included in the meaning of a warranty unless such circumstance is manifestly material to the risk."

The contention of appellants, that this provision of the contract required that all of the cotton harvested from these crops be warehoused, stored, and shipped, in addition to being marketed or sold, at or through the Tulare office of appellee, cannot be sustained. Such a construction is clearly not in accord with the general rule above stated. The trial court found that this provision of the contract had been complied with, and there is sufficient evidence in the record to support that find-

The defense of appellants that there was a failure to give final notice of loss within ten days after the harvesting operations were completed as required by the terms of the policies has been waived. No objection was made on that ground until the trial, and in the meantime appellants extended the time for the filing of proofs of loss until June 1, 1930, and required that the proofs of loss be filed on or before that date. Appellants also admitted that there were losses from perils insured against and entered into negotiations with appellee and the growers in an attempt to reach a satisfactory settlement of these claims. They cannot now claim a forfeiture for failure to give notice of loss within the time specified in the policies. 5 Cooley's Briefs on Insurance p. 4448; 7

Couch on Insurance 5595; California Civil Code, § 2636; Pasherstnik v. Continental Ins. Co., 67 Mont. 19, 214 P. 603.

A large part of the cotton harvested was sold on what is commonly termed "call sale." The cotton is sold and a certain sum advanced on the purchase price, but the fixing of the final sale price is reserved in either the buyer or the seller (here the seller) to be exercised within a definite period in the future. The main controversy in this case revolves around these transactions. It is claimed by appellants that to sell cotton on call was a breach of the provision of the policy requiring the growers to use due diligence to insure the marketing of the crops. Appellants admit that call sales of cotton are customary, and that the growers were not forbidden under the terms of the policy to sell their cotton on call. These transactions were in accordance with the custom and usages of the trade, and, when not specifically prohibited in the policies, are presumed to have been in contemplation of the parties at the time the contract was made. Koshland v. Columbia Ins. Co., 237 Mass. 467, 130 N. E. 41, 43; Fid. Union Fire Ins. Co. v. Ballew-Satterfield Co. (Tex. Civ. App.) 10 S.W.(2d) 163, 165. It cannot be said that there was a failure to use due diligence to insure the marketing of the cotton when the customary methods were pursued. Contracts to sell cotton on call are valid. Glover v. Killingsworth, 47 Ga. App. 559, 171 S. E. 234; S. C. Cotton Growers' Co-op. Ass'n v. Weil, 220 Ala. 568, 126 So. 637; Smith v. Duncan (Tex. Com. App.) 209 S. W. 140; Furrh v. Western Union Telegraph Co., 115 Tex. 125, 276 S. W. 645.

It is also claimed by the appellants that the records of appellee show only the amount advanced on the cotton sold on call (in most instances 16 cents per pound), and that there is no evidence as to the price finally fixed as the selling price. The evidence shows that the price for cotton on the day it was sold on call was 18 cents per pound, and that is the sale price placed on the cotton sold on call in determining the liability of the appellants. The records of appellee show that of this 18 cents per pound 16 cents per pound was advanced to the seller. Under the call sale contract, which was introduced in evidence, the buyer retained $10 per bale (approximately 2 cents per pound) as margin. Appellee does not contend that appellants should bear the risk of the future trend of the cotton mar-

ket. Appellants have no reason to complain when they were credited with the market price of cotton on the day it was sold on call and the fact that appellee and the growers saw fit to speculate on the future trend of the cotton market, as is a customary practice in the trade, should not prevent recovery for losses sustained due to perils insured against.

.Appellant, National Union Fire Insurance Company, contends that the policy issued by it covering the crops of Dave Davidson was void because of a breach of warranty therein respecting his interest in said crops. It was stated in the application for the policy that the applicant's undivided interest in each crop was 100%, and the applicant certified and declared as true "that the applicant's undivided interest in each crop is as herein stated; and that no other person, firm or corporation has any interest in said crops or any part thereof." The ad interim insurance provided for by the application became effective 72 hours after the application was signed by the applicant and by the agent for the insurance company, which signing took place on May 1, 1929. The policy, however, provided, "but this policy shall not be valid until countersigned by a fully authorized and regularly commissioned agent of this company." The policy was countersigned by a duly authorized agent of the company on October 11, 1929. Prior to that date the applicant had acquired assignments of the leases of the land described in the application and at the time the policy issued the assured, Dave Davidson, was the lessee and sole tenant in possession of the crops in question. The contention of appellant that the assured did not have a 100% interest in the crops on October 11, 1929, is based upon the terms of the different leases, two of which provided that lessee would pay to the landlord as rental twenty per cent. of the lint cotton grown on the land, and the other two of which provided for payment of rental on the basis of a percentage of the net proceeds arising from the sale of the crop. These provisions in the leases were merely a method of fixing the rental to be paid and did not give the landlords an interest in the growing crops. Imperial Valley L. Co. v. Globe G. & M. Co., 187 Cal. 352, 202 P. 129. The stipulation in the insurance policy to the effect that it is not valid until countersigned by an authorized agent of the company is one which the insurer has a legal right to make, and constitutes a condition precedent to the validity of the policy.

Burner v. American Ins. Co., 221 Mo. App. 1193, 300 S. W. 556; Davis v. Home Ins. Co., 125 S. C. 381, 118 S. E. 536. This provision in the policy fixing the effective date of the insurance thereunder is controlling as against a conflicting provision in the application. New York Life Ins. Co. v. Tolbert (C. C. A.) 55 F.(2d) 10. At the time the policy was countersigned the fact warranted was true. Therefore, there was no breach of the warranty of the policy.

The appellants make other claims for breach of provisions of the contracts of insurance by particular growers. We have examined these contentions and find them to be without merit, and it would serve no useful purpose to enumerate them in this opinion. There is sufficient evidence to sustain the trial court's finding that there was no breach of these provisions.

There is, however, a more serious controversy in connection with these "call sale" transactions. It is argued that no evidence was introduced from which could be determined the amount of the loss and the amount of insurance applying. Appellants contend that under the terms of the policies the amount of insurance applying is to be reduced pro rata where the average price per unit for cotton sold is less than the estimated average price used as a basis for the contract of insurance. This contention is based upon the following terms of the policies:

"9. *Limit of Liability and Method of Determining Same.*

"In the event that the crops herein described, or any part thereof, are damaged or destroyed by the peril or perils hereunder insured against, the liability of this Company shall in no event exceed the amount by which such loss or damage may cause the proceeds realized or to be realized from said crops to be less than the amount of insurance applying on said crops on the date of the termination of this contract, not including in said amount of insurance any amounts by which said insurance may have been and/or may be reduced in accordance with all of the terms and conditions of this contract; it being provided, however, that in no event shall this Company's liability exceed the amount stated in this policy.

"10. *Definition of Proceeds.*

"Unless otherwise provided by an agreement in writing added hereto, the word 'proceeds' * * * shall be construed to mean the gross amount received from the sale of

the crops insured hereunder and/or of any by-products therefrom; \* \* \* plus the actual value of any portion of said crops and/or of the by-products therefrom in any manner damaged, destroyed or confiscated after the same shall have been harvested; \* \* \* plus the actual value of said crops or any part thereof and/or of the by-products therefrom unharvested and/or unsold on the date of the termination of this insurance thereon (such actual value to be computed on the amount of said crops and/or of the by-products therefrom unharvested and/or unsold on said *said* of termination at the average of the prices paid for crops of like kind and quality f. o. b. at the location named in paragraph 4 hereinabove referred to during the period or periods provided therefor in part (c) of paragraph 7, hereinabove set forth). \* \* \*"

Paragraph 7 (c), referred to in paragraph 10 of the policy, was superseded by paragraph 7 of the prior inspection agreement attached to the policy and made a part thereof, and is as follows:

"7. That part of (c) of paragraph 7, and paragraph 8, both appearing on page two of the policy to which this endorsement is attached, are hereby deleted and the following substituted in lieu of the aforesaid part (c) of paragraph 7:

" 'In the event that the amount of loss or damage to the crops, or any part thereof, herein described by the perils hereunder insured against shall warrant claim hereunder in accordance with the terms and conditions hereof, in case it shall be determined upon the adjustment of any such loss that the average price per unit actually received for the number of units harvested from the crops insured hereunder (after making proper allowance for loss in grade occurring as a direct result of damage to said crops by perils hereunder insured against) is less than the average price per unit estimated by the assured in the assured's application for this policy, or in case no cotton and/or "bollie" cotton shall be harvested from said crops, if the actual average of the last quotations on the New York Cotton Exchange for January delivery cotton for each day during the six months' period next preceding the termination date of this policy, or, if such termination date shall occur after the first notice day for January delivery cotton on said exchange, during the six months' period next preceding said first notice day, is low-

er than the price per unit estimated by the assured in the assured's application for this policy, the amount of insurance applying per unit on said crops shall be reduced in the same proportion that the ascertained deficiency in such actual average price per unit bears to the said estimated average price per unit, the amount of insurance applying per acre and/or on such crops to be reduced in the same proportion and ratable portion of the premium to be returned to the assured in the event of such reduction in the amount of insurance'."

It is appellant's contention that under the above-quoted provisions, before the amount of insurance applying under these policies can be determined, it is necessary to first determine the "average price per unit actually received for the number of units harvested from the crops insured." If this average price actually received is less than the estimated average price in the assured's application, then there shall be a proportionate reduction in the amount of insurance applying. Where the cotton was sold on call and the transaction not closed before the expiration of the policy so that the final price was not fixed at that time, appellants claim there is no basis for determining the average price per unit actually received, and therefore no way of determining the amount of insurance applying, and consequently appellee should not recover in these actions.

Appellee, on the other hand, contends that these contracts of insurance are what are termed "valued policies," that is, the value of the subject-matter of the insurance was agreed upon by both parties and written in the face of the policy. This being so, appellee argues that all that need be done to determine the liability of appellants is to deduct from the amount insured, as set forth in each instance at the top of the application in dollars and cents, the proceeds as defined in paragraph 10 of the policy.

In determining whether a policy is a "valued policy" or an "open policy," in which the amount of insurance applying is to be determined after loss, the contract must be viewed in its entirety, and its provisions construed so as to give effect to the mutual intentions of the parties at the time the contract was entered into. In Stuyvesant Ins. Co. v. Jacksonville Oil Mill, 10 F.(2d) 54, 55, the Circuit Court of Appeals for the Sixth Circuit, in holding the policies sued on to be open policies, stat-

ed: "An examination of the contract of insurance here in controversy, both as a whole and in its several parts, leads directly to the conclusion that the parties contemplated and intended an open rather than a valued policy. Any other construction does violence to the plain and unambiguous language employed. The term 'not exceeding' is of frequent use, and, in the absence of qualification, is usually, if not always, one of limitation only. These words, when found in an insurance policy as a part of the statement of the amount of insurance, necessarily mean that the liability of the insurer shall not be more, but may be less, than the amount stated. In other words, the term 'not exceeding' in a policy of insurance denotes that uncertainty of amount which is the chief characteristic distinguishing an open from a valued policy. Cooley's Briefs on the Law of Insurance, vol. 1, p. 823."

See, also, Cooley's Briefs on Insurance, vol. 1 (2d Ed.) pp. 775, 776.

The policies involved in the case at bar do not fix a value upon the crops insured, but merely provide that the liability of the insurer shall not exceed the amount set out in the application. Under paragraph 7 of the prior inspection agreement, supra, the amount of insurance applying is dependent upon the average price per unit actually received for cotton harvested or, in case no cotton is harvested, upon the average daily quotation on the New York Cotton Exchange for the six months' period specified. It is clearly intended to be an open policy under which the amount of insurance applying in case of loss is to be subsequently determined, but in any event not exceeding the amount set forth in said application. Hemmer-Miller Dev. Co. v. Hudson Ins. Co. of N. Y., 59 S. D. 129, 238 N. W. 342; Cal. Civil Code, §§ 2595, 2596.

Even though we construe the policies herein involved as open policies, there still remains the question of whether or not there is sufficient evidence upon which to fix the liability of the appellants under the terms of the policies. It is admitted that the "call sales" were actual sales and delivery of the cotton was made thereunder to the buyer. The market price of the cotton on the day it was so sold was 18 cents per pound, of which 16 cents per pound was credited to the seller and two cents retained by the buyer as margin or security.

The obvious purpose of the provisions of paragraph 7 of the prior inspection agreement is to make the contract of insurance one of indemnity, that is, in case of loss from perils insured against, to put the insured in the position he would have been in had there been no such loss. If the cotton harvested had sold for only 16 cents per pound, the insurance company, in cases of loss from perils insured against, would have been liable only for an amount that would have been the equivalent of 16 cents per pound for the cotton lost. The contract of insurance was not a guarantee of a certain price (here 18 cents per pound the estimated price used in the application) for all cotton lost because of perils insured against. In case the cotton was not sold prior to the expiration of the policy it is conceded by the parties that the average of the prices paid for crops of like kind and quality, f. o. b. Tulare, Cal., for a six months' period was to be used in determining the value thereof. In case the cotton was sold the amount actually received was to be used. However, a call sale does not fall strictly within either of these two categories. While the cotton is actually sold and title thereto passes to the buyer, as between the buyer and the seller the price to be paid by the buyer is not finally fixed. The policies of insurance herein involved terminated on January 31, 1930, and the liability of appellants thereon is to be determined as of that date. On January 31, 1930, this cotton was either sold or unsold. Both parties admit that this cotton was actually sold and title had passed to the buyer. Appellants, however, contend that because the seller had not finally fixed the price for this cotton on or before January 31, 1930, the liability of appellants on these policies cannot be determined. There is nothing in the policies restricting the right of the insureds to sell cotton on call, and the termination of the policies before the call sale transaction is completed by the fixation of the sale price by the seller cannot prevent a recovery for losses due to perils insured against, unless the policy specifically so provides. The trend of the cotton market after January 31, 1930, the termination date of these policies, cannot affect the liability of the appellants. So far as this case is concerned, it is immaterial whether the cotton sold on call is valued 18¢ per pound (16¢ advanced by the buyer and $10 a bale retained by the buyer as margin) or at the average prices paid at Tulare for the six months' period specified, as in neither event

are the appellants entitled to a reduction of the amount of insurance applying under the terms of the policies. However, since this cotton was actually sold, the question for determination is as to what price is to be attributed to it since there was no price finally fixed before the termination of the policies. There is no provision in the policies for a reduction in the amount of insurance applying in the event that there is cotton on hand and unsold at the termination of the policies, which might be valued at a figure lower than the estimated average price in the assured's application, although the policies do provide that in determining "proceeds" under paragraph 10 of the policies, such cotton shall be valued at the average prices paid at Tulare for cotton of like kind and quality for the six months period specified. Had the cotton been sold for cash instead of on call on the day of the sale, the price of 18 cents per pound would have been actually received by the seller, and that price used in determining the liability of appellants. As between the seller and the insurance company, the only fair price to attribute to cotton sold on call is the price for which it could have been sold for cash on the day of the sale, unless the call option has been exercised by the seller before the termination of the policies, which case is specifically covered by the terms of the policy requiring the amount actually received to be used as the value of such cotton. The obvious purpose of the provisions of paragraph 7 of the prior inspection agreement is attained by treating cotton sold on call the same as if it were sold for cash on the day of the sale, that is, treating it as though it were sold for the market price on the day it was sold on call. For purposes of fixing the liability of appellants, if the market price on the day of the sale is used as the measure, the element of risk involved as to the future trend of the cotton market is entirely eliminated and left to be borne solely by the insured, as it should be. This is the reasonable construction to be placed upon the provisions of the contract of insurance in view of the object sought to be attained and the fact that call sales are customary in the trade and not forbidden by the policy. The contract of insurance does not specifically take into account call sale transactions, and any uncertainties in the policy must be construed in favor of the insured in accordance with the rules above stated. The trial court did not commit error in holding that there was suffi-

cient evidence upon which to determine the liability of appellants under the terms of the policies.

Appellants contend that appellee should not recover in these actions because they were commenced prematurely. The provision in the policy for payment of loss makes such loss payable 60 days after satisfactory proof of loss has been received by the company. The proofs of loss were furnished to appellants on May 31, 1930, and these actions were commenced on July 21, 1930, only 51 days after furnishing proofs of loss to appellants. Appellants argue that there was nothing due and payable at the time these actions were instituted. It appears from the evidence and is admitted by appellants that negotiations were in progress between the parties from February 3, 1930, up to and including July 3, 1930, in an attempt to settle these claims. After the claims were filed, appellants' representatives offered a lump sum settlement of $252,000 for these claims, together with a large number of others not here involved, but stated that in no event would the insurance carriers settle the claims as they were presented in the individual cases. Appellee claims that this amounted to a denial of liability on the part of the appellants which constituted a waiver of the provision that payment is not due until 60 days after filing proofs of loss. Appellants, however, argue that this was not an unconditional and absolute denial of liability so as to constitute a waiver, but that they at all times admitted some liability for losses due to perils insured against.

The agents of the insurance company stated they would not pay the claims as presented; that they would not pay any single or individual claim as such. The offer of the lump sum in settlement of the claims involved in this litigation and of the claims required other releases from each of the growers. While such a conditional offer is not a denial of all liability under the policies, it was a flat denial of any obligation to pay any individual policyholder the amount of his loss. Each claimant had a right to the allowance of his individual claim. Therefore, such a denial would constitute a waiver of the provision of the policy with reference to the filing of the action before the expiration of 60 days from the time of the presentation of the claim. No similar case has been called to our attention, but the principle involved has been passed upon in the cases holding that

a flat denial of liability by the insurance company in effect waives the obligation of the insured to withhold action until the expiration of the period of 60 days, which period was obviously intended to allow the company ample time to consider claims before suits were brought. Norwich & N. Y. Transportation Co. v. Western Mass. Ins. Co., 6 Blatchf. 241, Fed. Cas. No. 10,-363, affirmed 12 Wall. (79 U. S.) 201, 20 L. Ed. 380; Depue v. Travelers' Ins. Co. (C. C.) 166 F. 183; Paez v. Mutual Indemnity, etc., Co. of Cal., 116 Cal. App. 654, 3 P.(2d) 69; Globe & Rutgers Fire Ins. Co. v. Batton, 178 Ark. 378, 10 S.W.(2d) 859; Nat'l Live Stock Ins. Co. v. Wolfe, 59 Ind. App. 418, 106 N. E. 390; Day v. Hustisford Farmers' Mut. Ins. Co., 192 Wis. 160, 212 N. W. 301.

## Costs.

 These actions were tried together in the court below and the witnesses were sworn and testified only once; their testimony being used in both cases. In taxing costs, the trial court allowed full witness fees and mileage in each case. Appellants contend that this created an unwarranted duplication in this respect. The actions were not between the same parties, and consequently R. S. § 848 (28 USCA § 601) is not applicable. In Wooster v. Handy (C. C.) 23 F. 49, 64, the court said: "By section 848, a witness is allowed one dollar and fifty cents for each day's attendance in court, or before an officer pursuant to law. This necessarily means that he is entitled to that in each suit in which he attends. The same section makes special provision for the case where a witness is subpoenaed 'in more than one cause between the same parties, at the same court'; thus leaving the case where he attends in more than one cause between different parties, or where only one of the parties is the same, to be regulated by the general provision, in the absence of any rule of court, or special order, or stipulation of parties. This view was held in Parker v. Bigler [Fed. Cas. 10,726], 1 Fish. [Pat. Cas.] 285 in 1857, in the circuit court for the Western district of Pennsylvania, by Mr. Justice Grier."

In Archer v. Hartford Fire Ins. Co. (C. C.) 31 F. 660, 662, the court said: "The parties or their counsel should look to the economies of the case during its preparation for trial, and count the costs while it is in progress, taking the necessary steps to prevent useless expense before taxation rather than afterwards."

There was no stipulation or agreement as to witness fees and mileage to be taxed as costs in the case at bar, and the general rule therefore applies. There was no error in allowing witness fees and mileage as costs in each case.

 Appellee has filed a cross-appeal and assigns as error the failure of the trial court to allow interest from August 1, 1930, the date on which payment was due under the terms of the policies sued on. On July 31, 1933, the trial court ordered that judgment be entered for appellee and against appellants in the amounts set forth in the order, and, further, that findings of fact and conclusions of law be filed. The conclusions of law, subsequently filed, in part read as follows: " * * * Together with interest thereon at the rate of seven per cent per annum from the 29th day of July 1933, to and including the date of judgment. * * *" Judgment was entered on the findings on November 18, 1933. It is apparent from these facts that the trial court considered these claims to be unliquidated, and, until their amounts were ascertained preparatory to the entry of judgment, no interest should be allowed.

Cross-appellant contends it was entitled to interest from August 1, 1930, basing its contention on sections 3287, 3302, of the Civil Code of California, which provide:

"§ 3287. Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt."

"§ 3302. The detriment caused by the breach of an obligation to pay money only, is deemed to be the amount due by the terms of the obligation, with interest thereon."

In Concordia Ins. Co. v. School Dist., etc., 282 U. S. 545, 51 S. Ct. 275, 278, 75 L. Ed. 528, the Supreme Court had under consideration a case very similar to the case at bar. In that case interest had been allowed on the amount recovered on a fire insurance policy beginning 60 days from the last date upon which proofs of loss were due under the terms of the policies. The statutes of Oklahoma (Comp. Okla. Stat. 1921, §§ 5972, 5977) relied on as controlling

such allowance of interest were almost identical in language with those of California above quoted. The Supreme Court in its opinion stated the general rule that a federal court will follow the decisions of the highest court of a state construing a state statute, and then proceeded to review the decisions of the Supreme Court of Oklahoma construing the statutes above referred to. The conclusion reached by the court was that the state Supreme Court had not definitely construed the statute as applied to the situation then under consideration at the time the trial court entered its judgment, so that the federal court was free to construe the statute for itself. Mr. Justice Sutherland, speaking for the court, then stated: "In the absence of an authoritative state decision to the contrary, there was nothing in either [sections 5972, 5977, Comp. Okla. Stat. 1921] which required the trial court in rendering its judgment to depart from the rule in respect of the allowance of interest which this court had recognized, namely, that, even in a case of unliquidated damages, 'when necessary in order to arrive at fair compensation, the court in the exercise of a sound discretion may include interest or its equivalent as an element of damages.' Miller v. Robertson, 266 U. S. 243, 257–259, 45 S. Ct. 73, 78, 69 L. Ed. 265, and cases cited. See, also, Standard Oil Co. v. United States, 267 U. S. 76, 79, 45 S. Ct. 211, 69 L. Ed. 519; Bernhard v. Rochester German Ins. Co., 79 Conn. 388, 397, 65 A. 134, 8 Ann. Cas. 298."

It is argued by cross-appellant that the damages allowed by the court were certain by calculation and reference to readily ascertainable and fixed market values, and that the right to such damages became vested on the date payment was due under the terms of the policies, that is, 60 days after filing proofs of loss on May 31, 1930. While it is true that the method of determining the liability of the insurers is set forth in the policies, it remained for the court to ascertain the amount of such liability from the evidence introduced at the trial. It is to be noted that in no case was the amount recovered on any claim as large as the amount claimed in the proofs of loss, nor was the liability of the insurers determined by the court on the same basis as that used in making out the proofs of loss.

No case decided by the Supreme Court of California has been called to our at-

tention, and we have found none that is controlling in the situation presented in the case at bar. In Anselmo v. Sebastiani, 219 Cal. 292, 26 P.(2d) 1, the bill of particulars furnished by the plaintiffs to defendants was found by the court to be correct, and interest was allowed prior to the entry of judgment under Civil Code, § 3287, because the amount due could be determined by mere calculation from the bill of particulars. The court in that case tends to the view that whether the damages are liquidated or unliquidated is not determinative of the question of interest. In Gray v. Bekins, 186 Cal. 389, 399, 199 P. 767, in an action for recovery on the basis of quantum meruit, the court allowed interest from the date the answer was filed because the answer was construed to be an acknowledgment of the plaintiff's claim to the extent therein admitted and subsequently found due by the trial court. In that case the court stated the test to be applied was whether or not the exact amount found to be due was known and admitted by defendant to be due plaintiff. In Perry v. Magneson, 207 Cal. 617, 622, 279 P. 650, in an action on a contractor's indemnity bond, it was held that it was necessary for plaintiff to prove a loss by reason of breach of the building contract before he was entitled to recover on the bond and until the amount of such loss was determined by the court, the claim was uncertain and unliquidated and no interest should be allowed. In Mabrey v. McCormick, 205 Cal. 667, 669, 272 P. 289, the California Supreme Court stated: "Plaintiffs claim interest from the date of the third bill rendered by them, at which time they state the amount due became certain (section 3287, Civ. Code). Had the court found for them, this contention would be sound."

The court, however, decided that it was by reason of the action of plaintiffs that the amount due was unliquidated until determined by judgment of the court so that interest prior to judgment, as damages, was not allowable.

If the proofs of loss filed by the insureds in the case at bar had set out the claims in the manner and amounts as subsequently found due by the trial court, it would seem to follow from the above cases that interest would be allowable from the date payment became due under the policies. However, the appellee did not furnish data to the appellants in the proofs of loss from which appellants' liability could be calculat-

ed as was actually found due by the trial court, and, until their liability was determined by the trial court, it remained uncertain.

█ Cross-appellee contends that interest should not have been allowed on the amount recovered prior to the entry of final judgment on November 18, 1933. As stated in Concordia Ins. Co. v. School District, supra, in absence of an authoritative state decision to the contrary, the sections relied on (Civ. Code §§ 3287, 3302) do not require a departure from the rule recognized by the Supreme Court, namely, "when necessary in order to arrive at fair compensation, the court in the exercise of a sound discretion may include interest or its equivalent as an element of damages." If the trial court can, within its discretion, allow interest for the whole period, it can also allow interest for only a part of the period. In this case the trial court has exercised its discretion by allowing interest from July 29, 1933, in order to arrive at fair compensation. We cannot say that such allowance of interest was an abuse of discretion. There was no error in the trial court's allowance of interest.

Judgments affirmed.